*519
 
 PER CURIAM.
 

 Willie James Hodges was convicted of first-degree murder for the killing of Patricia Belanger in 2001. Hodges was sentenced to death. This case is before the Court on appeal from the conviction and death sentence. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence.
 

 I. BACKGROUND
 

 The evidence presented at trial established that on the morning of December 19, 2001, Hodges entered Belanger’s home, fatally stabbed and bludgeoned her, and then fled through a window.
 

 Several of Belanger’s relatives testified that they drove to her house that morning to take Belanger to the airport. The family was going to visit out-of-town relatives for the holidays. Stanley Clinton Taylor, Belanger’s son-in-law, explained that when he, his wife, their children, and his father arrived at Belanger’s home, her front door was closed and locked. The family knocked, but no one answered. Debra Taylor, Belanger’s daughter, used her key to unlock the door, but once unlocked, the door would not open. The family looked for an unlocked window and tried the front door again. That time, the door opened but only about an inch. After walking around the house, Stanley returned to the front door and found it completely closed and again locked. As Stanley unlocked the door, he heard his stepson say that he saw someone in the house, and at about the same moment, he heard glass break. Stanley was then able to reach in the door and move the chair that was blocking it. Joe Taylor, Stanley’s father, similarly testified that as they entered in the house, he heard crashing noises and glass breaking. Once the door was open, Stanley saw Be-langer lying face down in the dining room. Her jacket was wrapped around her head and her pants were pulled down around her legs.
 

 Debra testified that as she heard the glass breaking, she saw a man run from the house. The man then “hurdled” the fence in Belanger’s yard. He wore a blue and gray jacket, a black hood that was like a ski mask, and dungaree-style jeans. Debra described him as taller than five feet four inches but shorter than six feet tall. The man was carrying something, but Debra could not identify the object because it appeared to be wrapped in black cloth. Debra never found her mother’s purse, her wallet, or her driver’s license in the house.
 

 Stanley and Joe called 911. Michael Rayborn, an officer with the Escambia County Sheriffs Office (ECSO) in December 2001, was dispatched to Belanger’s home. After being told about the man seen fleeing from the house, Rayborn called for a K-9 unit. Robert Nowlin, Jr., an officer with ECSO in December 2001, and his canine partner Rex arrived about fifteen minutes later and began to track the suspect from the east side of the residence where a window was broken. Rex immediately jumped the fence in Belan-ger’s yard. Nowlin found a white sock just over the fence. Rex then tracked to the rear of the neighbor’s yard and jumped another fence. Nowlin found another white sock. Rex tracked through a swampy area, in which Nowlin found a shoe. Rex continued to a clay pit, where Nowlin saw footprints from someone running barefoot. Rex and Nowlin continued through a wooded area into an open field. They followed the wood line to Hollywood Drive, where Rex lost the scent. Nowlin then had the dog track in reverse. As they returned to Belanger’s home, Nowlin found another shoe and a Members Only jacket.
 

 
 *520
 
 Several law enforcement officers testified about the crime scene at Belanger’s home. When law enforcement officers arrived, Belanger was lying face down in the dining room. Her pants and panties were pulled down to her legs and a jacket covered her head. Blood was pooling on her right side. A claw hammer and a brown leather braided belt were found near the body. A bedroom window on the right side of the house was broken, and a knife and several photographs were on the ground outside the window. The knife had a black plastic handle, while the knives in Belanger’s kitchen had wooden handles. The dresser in the master bedroom, the room where the window was broken, had a drawer full of crew-style white socks similar in style to the socks found by Nowlin.
 

 Dr. Gary Dean Cumberland, who was the Chief Medical Examiner of the First District of Florida in 2001, testified about Belanger’s injuries and cause of death. He found two lacerations on Belanger’s head and fractures to her skull under the lacerations. Dr. Cumberland opined that the head injuries were consistent with having been inflicted by a hammer and were consistent with being caused by the hammer in evidence. Dr. Cumberland testified about an incised wound that was four and three-quarter inches in length and a stab wound to Belanger’s neck, which cut her jugular vein. He opined that the neck wounds were the correct shape and depth to have been caused by the steak knife in evidence. Dr. Cumberland further opined that any one of the four wounds to Belan-ger’s head and neck would have been life-threatening. Dr. Cumberland also described two superficial tears to the victim’s rectum, which were each a quarter-inch long, and several other wounds, some of which were typical of defensive wounds. Dr. Cumberland concluded that the manner of death was homicide and that the cause of death was related to the wounds inflicted by the hammer and the knife.
 

 Various witnesses connected Hodges to the jacket, shoes, belt, knife, and photographs found in and near Belanger’s home. Debra Taylor testified that the recovered Members Only jacket and shoes looked like the clothing worn by the man she saw running from her mother’s home. Jimmy Lee Williams, a relative of Hodges by marriage, identified the Members Only jacket and shoes as items that Hodges wore during the approximate period of 2000-2002. Tamara Wolfe, who had a relationship with Hodges in 2001, testified that when she knew Hodges, he wore a brown, braided leather belt and carried a steak knife with a black handle. She identified the belt and knife collected from Belanger’s home as being similar to the items she knew Hodges to possess. Bonnie Chandler, who dated Hodges for about five years beginning around 1995, testified that Hodges kept a steak knife with a black handle in the car that he drove. Chandler’s daughter Mary “Emmy” Chandler testified that some of the photographs found outside Belanger’s window were photographs that she had mailed to Hodges. Emmy testified that one of the photographs had her writing on the back. The State and the defense stipulated that the sentence “I love you very much, Willie,” found on another photograph, was written by Hodges. Two latent print examiners testified that fingerprints found on two of the photographs matched Hodges’ known prints.
 

 Other witnesses connected Hodges, who was originally from Epps, Alabama, to Belanger’s neighborhood in Pensacola, Florida. Williams’ wife, Cora Hodge,
 
 [1]
 
 
 *521
 
 explained that Hodges had relatives in Pensacola. Barbara Pauline Marshall, Belanger’s neighbor, testified that her boyfriend, who often lived with her, was related to Hodges and that Hodges had been to her home “[mjaybe two times” prior to Belanger’s murder.
 

 Several analysts testified about the DNA testing of physical evidence collected from the Belanger crime scene. The DNA profile developed from blood on one of the socks found by Nowlin was the same as Hodges’ known DNA profile on all thirteen markers, and partial DNA profiles developed from the other sock were also consistent with Hodges’ known DNA profile. Mitochondrial DNA from a hair recovered from Belanger’s jeans excluded Belanger but could not exclude Hodges as the donor. Mitochondrial DNA from one of the hairs recovered from the Members Only jacket likewise could not exclude Hodges. By using Y-chromosome short tandem repeat (YSTR) DNA testing, an analyst was able to detect male DNA from an anal swab of the victim. The partial YSTR DNA profile matched Hodges’ DNA profile on the six available markers.
 

 Dr. Martin Tracy, professor of biological sciences at Florida International University in Miami, testified about the statistical significance of the DNA evidence developed in this case. He explained that the mitochondrial DNA profiles from a hair recovered from Belanger’s jeans and from a hair recovered from the Members Only jacket would exclude 99.88 percent of individuals selected at random. The partial YSTR DNA profile developed from the sperm fraction of the anal swab would exclude 96 percent of the male population and all of the female population. The partial DNA profile developed from the top of the sock found in Belanger’s neighbor’s yard excluded 99.92 percent of the male population and all of the female population, and the partial DNA profile developed from the heel and toe of the sock excluded 99.99 percent of the male population and all of the female population. Finally, the frequency of the profile found on the other sock, which matched Hodges on all thirteen available markers, is one in 990 quadrillion. Consequently, Dr. Tracy opined that at some point Hodges wore the sock.
 

 In addition to evidence about the Belan-ger homicide, the State introduced evidence of a collateral homicide pursuant to
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959). The State presented the following evidence to establish that Hodges fatally stabbed Lavern Jansen in her home in Cincinnati, Ohio, on March 19, 2008.
 

 The State introduced the recording of a 911 call placed by Margaret Winkle, Jansen’s neighbor. Winkle told the 911 operator what she could see through her peephole and hear through her door. A man knocked on Jansen’s door, and the man and Jansen talked for a bit. After hearing the man tell Jansen to shut up, Winkle saw the man on top of Jansen, who was lying on the floor. The man closed Jansen’s door. After a few minutes, Winkle saw the man leave the apartment building. Law enforcement officers testified that when they responded to Winkles’ 911 call, they found Jansen’s body about five or six feet inside her apartment. Jansen’s bra had been pulled up, and her pants and underwear were lying behind her head. There was broken glass by her feet, blood around her body, trauma to her face, and stab wounds to her neck and chest. Jansen had left her bank that morning with nearly $200 in cash, but the officers could not find Jansen’s wallet, purse, ID, or the cash in the apartment. A partial YSTR DNA profile of five markers was- developed from sperm cells found on a swab of the victim’s vagina, and a partial YSTR DNA profile of seven markers was devel
 
 *522
 
 oped from epithelial cells on the vaginal swab. Hodges’ DNA profile matched all available markers on both YSTR DNA profiles.
 

 Daniel Lawrence Schultz, M.D., testified that he performed an autopsy of victim Jansen. He found a half-inch tear in the victim’s vagina, signs of strangulation or chest compression, a five-inch deep stab wound to the chest, a four-inch deep stab wound to the neck, and an incised wound to the neck. He opined that the stab wounds were made by a single-edged knife and were consistent with being made by a steak knife. Dr. Schultz also described other wounds, including a bruise on the victim’s left thigh that was probably a bite mark. Dr. Schultz concluded that the manner of death was homicide. Dr. Phil J. Levine, a forensic dentist, opined that the bite mark on Jansen’s thigh was made by a human and that based on dental impressions, he could not exclude Hodges’ teeth from being the teeth that made the bite mark.
 

 Additionally, two witnesses testified that Hodges confessed to them that he committed two murders. Keiwon Breedlove, Hodges’ cellmate in the Escambia County Jail in 2006, testified that Hodges told him that Hodges committed a murder in Pensacola, Florida. Hodges stated that he went into the home next door to a relative, intending to burglarize the home in order to support his crack cocaine addiction. Hodges described the crime as follows. Once in the home, Hodges hit a woman in the head and stabbed her with a knife. When someone knocked at the front door, he barricaded the door and left through a side window. He then jumped a fence, ran through a pond or lake, and left behind his windbreaker, his shoes, his socks, and his mask. Hodges explained that he left photographs at the scene to try to frame his relative Vonkish Golden. Breedlove also testified that Hodges stated that he committed a murder in Cincinnati, Ohio, in the “early nineties or whatever.” Hodges did not tell Breedlove any details about the Cincinnati homicide.
 

 Debra Michelle Silvers testified that she has known Hodges for about eighteen years. Hodges dated Silvers’ mother. Silvers stated that Hodges called her in May 2008, stating that he wanted her to come to Florida so that he could give her a piece of jewelry for her birthday. Hodges told her that he killed a woman in Ohio by cutting her throat and that he had sex -with the victim and stole a watch, a ring, a wallet with credit cards, and $200. Silvers explained that she thought Hodges was joking. Silvers further testified that Hodges also told her about committing a murder in Florida. Hodges said that he entered a woman’s house through the back door while she was making her bed and cut the woman with a kitchen knife. Hodges told Silvers that he took some things from the woman’s house and that he left something behind when he fled. When shown one of the photographs -found in Belanger’s yard, Silvers identified it as similar to but different in size from a photograph she knew Hodges to have.
 

 On March 7, 2008, a jury found Hodges guilty of first-degree murder by general verdict. The trial court then conducted a penalty phase from March 17 to March 20, 2008.
 

 During the penalty phase, several witnesses testified about Hodges’ prior criminal record. The evidence established that Hodges had been convicted of robbery for forcibly stealing a purse from an elderly woman and aggravated assault for threatening to kill another man while brandishing a knife. Hodges was on parole for the robbery offense at the time of Belanger’s murder. Other State witnesses offered victim-impact testimony.
 

 
 *523
 
 The defense called expert and lay witnesses to testify about Hodges’ mental health and background. Dr. Brett Turner testified that Hodges was in special education classes as a child and that Hodges’ IQ was tested in the fifth and seventh grades. Each IQ test resulted in a score of 66, which is in the mildly mentally retarded range. Hodges had a history of head injuries and substance abuse. Dr. Turner opined that Hodges exhibited mild dysarthria — “a condition that you find with some people who either have some type of neurological disorder because of a brain injury or brain disease, something of that nature or it can be also associated with other conditions, such as mental retardation.” It is “basically slurred speech and difficulty annunciating words correctly.” Dr. Turner also stated that Hodges “did not use a lot of large words and things” and this vocabulary would be “typical of someone having mental retardation.”
 

 Dr. Turner explained the different tests that he performed on Hodges. Dr. Turner stated that Hodges’ results “across the tests ... were consistent with a mild range of impairment for his abstract reasoning abilities and executive functioning.” Dr. Turner opined that this impairment could affect Hodges’ ability to correct his behavior. Specifically, on the Wechsler Adult Intelligence Scale III (WAIS-III), Hodges tested as having a full-scale IQ of 62, which is in the mild mental retardation range. And on the Wide Range Achievement Test, Hodges performed at a second-grade level in reading, a third-grade level in spelling, and a fourth-grade level in arithmetic.
 

 Regarding the adaptive-functioning prong of a diagnosis of mental retardation, Dr. Turner concluded that Hodges had impairment in conceptual skills, based on Hodges’ poor academic performance; impairment in social skills, based on Hodges’ history of not obeying rules or the law; but no impairment in practical skills, based on Hodges’ daily activities. Dr. Turner noted that impairment in all three categories is not required in order for a person to be considered to have a deficit in adaptive functioning for purposes of a diagnosis of mental retardation. Dr. Turner explained that he does not use the Vineland Adaptive Behavior Scales test — which asks individuals who know the patient to answer questions about the patient — to measure adaptive functioning because he thinks the test results are often confusing rather than useful. In evaluating Hodges, Dr. Turner also did not speak to Hodges’ family members, friends, or anyone with whom Hodges had lived. He spoke to only one of Hodges’ former employers and did not review records about Hodges except for Hodges’ school records.
 

 Dr. James Larson, a psychologist specializing in forensic psychology, testified that he examined Hodges, • reviewed records about Hodges, interviewed family members and other individuals, and reviewed evaluations of Hodges performed by other doctors. Dr. Larson testified that he learned that Hodges came from an impoverished background and was raised by parents who drank excessively and fought with one another. Two of Hodges’ siblings were “[ajpparently” mentally retarded, and one of those siblings spent some time in a mental institution. Jail records indicated that Hodges had been diagnosed with posttraumatic stress disorder (PTSD), generalized anxiety disorder, and depression, and had been treated with two or three different psychotropic medications and antidepressants. Dr. Larson also indicated that Hodges was addicted to illegal drugs. Dr. Larson opined that due to his drug addiction and mental retardation, Hodges’ capacity to conform his conduct to the requirements of the law was substantially impaired. But on cross-ex-
 
 *524
 
 animation, Dr. Larson testified that he believed Hodges knows right from wrong and that Hodges never lacked the capacity to appreciate the criminality of his conduct.
 

 Connie Gail Hodge Lockett, Hodges’ half-sister, explained that as children, all of the siblings shared one bedroom and they received no encouragement from their family about school. Lockett stated that her mother and stepfather drank and argued and that her mother once shot her stepfather in the groin. In 1995, her sister and mother were killed in a car accident, and within one year, her stepfather also died. Lockett stated that Hodges and one other brother were in special education classes and that her older sister Dorothy had mental problems. Catherine Hodge, another of Hodges’ sisters, testified that Hodges moved away when he was around thirteen years old. Catherine stated that when Hodges was a child he complained about headaches. She stated that Hodges wrote their mother letters, in which he talked about what he was doing and about his girlfriend.
 

 Chandler, who had testified during the guilt phase, gave more detail about her relationship with Hodges. Hodges and Chandler lived together, and Hodges referred to Chandler as his wife and Chandler’s children as his family. Hodges was employed for about six months during the course of their relationship, primarily through temporary agencies. Hodges had a fairly serious drug problem while living with Chandler. Their relationship ended around 2000. Chandler found drug paraphernalia in her house and learned that Hodges pawned items belonging to her, her parents, and her son.
 

 Ben William Thomas testified that Hodges had worked for him as a laborer in the masonry and restoration business, that Hodges was a good worker, and that Hodges did not need constant supervision. Hodges’ duties included mixing mortar, carrying bricks, cutting bricks, erecting scaffolding, sweeping, and cleaning. Hodges used equipment such as a wheelbarrow, shovel, saw, drill, and mortar mixer. Hodges also drove Thomas’s vehicle to get supplies and lunches and returned with the proper items. When Hodges was in prison, Hodges wrote Thomas a letter asking to again work for Thomas.
 

 Lonnie May testified that he met Hodges in 2002, when both were incarcerated at the Hamilton County Justice Center. May and Hodges shared a cell for approximately six months. When May was first incarcerated, he was paralyzed in his left leg from a gunshot wound, and the jail would not allow him to have crutches. May stated that Hodges helped him exercise his leg and learn to walk again. According to May, Hodges wrote letters and did not get help from other inmates, except for occasionally asking May how to spell a word.
 

 In rebuttal, the State presented Dr. Lawrence Gilgun, a psychologist. When he was first appointed by the trial court, Dr. Gilgun administered the WAIS-III intelligence test and determined that Hodges’ full-scale IQ was 69. Dr. Gilgun stated that he also gave Hodges the Stanford-Binet test, and Hodges obtained a full-scale IQ score of 65. On the Wide Range Achievements Test, Hodges was on a second-grade level in reading, third-grade level in spelling, and fourth-grade level in arithmetic. Dr. Gilgun stated that Hodges could not spell simple words such as “train” and “circle.” Dr. Gilgun opined that Hodges did not suffer from PTSD and that drug abuse “[v]ery frequently” leads to anxiety. Dr. Gilgun opined that Hodges suffered from an antisocial personality disorder.
 

 While Dr. Gilgun had initially opined during a pretrial hearing that Hodges was
 
 *525
 
 mentally retarded, after considering additional information and giving the Vineland Scales tests to Chandler and Wolfe, Dr. Gilgun concluded that Hodges was not mentally retarded. Dr. Gilgun concluded that Hodges did not meet the definition of mentally retarded because he did not have deficits in adaptive functioning. Dr. Gil-gun stated that the materials he reviewed established that throughout his life, Hodges held down jobs, drove a car extensive distances, had relationships with women, made change, shopped, cooked, and played sports. Dr. Gilgun also cited Hodges’ ability to convince individuals to send him money in a manner that would avoid having the money credited to his inmate account and Hodges’ elaborate efforts — including a misleading three-way phone conversation — to try to convince a woman he was corresponding with that he had a daughter and was a good family man. Hodges’ deceptive acts “impressed” Dr. Gilgun as “being above where one would function if he were retarded.” Dr. Gilgun was also impressed by Hodges’ ability to select poetic language from other sources to insert into his own letters. Regarding Hodges’ low IQ scores, Dr. Gil-gun further explained that cultural aspects can affect how a person performs on IQ tests. He stated, “There has been a tremendous amount of research ... that IQ tests tend to underestimate particularly the intelligence of African-Americans.”
 

 On March 20, 2008, by a vote of ten to two, the jury recommended a death sentence. Based on section 921.137(4), Florida Statutes (2008), defense counsel moved that the trial court appoint two independent experts to evaluate whether Hodges was mentally retarded. The trial court denied the defense’s motion, noting that before trial the court conducted the required mental retardation hearing based on Florida Rule of Criminal Procedure 3.203.
 

 On May 6, 2008, the trial court conducted a hearing pursuant to
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993), at which the defense presented several witnesses. Willie Mae Ross, one of Hodges’ cousins, testified about Hodges’ life growing up in a crowded home in Epps, Alabama, and about his visits to Pensacola. Rosia Ptomey, Hodges’ cousin and Ross’s mother, explained that the family home was average for the place and time and that Hodges had visited her in Pensacola. Theresa Farley Walsh, a defense investigator, testified that she spoke with many of Hodges’ friends, relatives, and acquaintances in an effort to investigate mitigation. As for Hodges’ childhood, she was told that Hodges’ father had an alcohol problem, Hodges’ family lived in extreme poverty, Hodges was a slow learner and a “high energy” child, and Hodges left home for days at a time starting at around age ten to thirteen. As for Hodges’ adult life, Walsh was told that Hodges had used heroin, marijuana, LSD, cocaine, and crack; failed some drug tests while on parole; worked in the logging industry; helped a fellow inmate who needed physical rehabilitation; and had a relationship with that inmate’s mother.
 

 Two mental health experts also testified on behalf of the defense. Dr. Kevin Groom, a psychologist specializing in clinical neu-ropsychology, explained that he administered several clinical tests to Hodges. Dr. Groom diagnosed Hodges as being clinically depressed, as having adjustment disorder and anxiety, as having mild mental retardation, and as having the physical disorders of diabetes and glaucoma. Dr. Groom testified that Hodges claimed to have used crack cocaine since 1988 and to have had a history of head injuries, but he found an MRI and CAT scan of Hodges’s brain to be “unremarkable.” Dr. Groom explained that Hodges had difficulty with frontal lobe executive functions and did not
 
 *526
 
 show the ability to think abstractly. Dr. Groom further explained that concrete rather than abstract thinking is common in individuals who suffer from mental retardation. He also opined that Hodges’ small vocabulary and difficulty in pronouncing words were consistent with limited intellectual functioning. Dr. Groom testified that he was not asked to evaluate Hodges’ adaptive functioning but that in his opinion Hodges’ performance on the neurological tests, Hodges’ academic achievement, and the Vineland Scales tests were consistent with a diagnosis of mental retardation and demonstrated that Hodges functioned at the level of a ten- to twelve-year-old child.
 

 Dr. James Larson testified that he believed that Hodges was correctly diagnosed as having mild mental retardation. Dr. Larson opined that Hodges functioned approximately at the level of an eleven-year-old child and that Hodges’ employment history and lifestyle were not inconsistent with a diagnosis of mental retardation.
 

 Finally, Hodges made a statement at the
 
 Spencer
 
 hearing. He stated that he and his relative Vonkish Golden had been at Belanger’s house about two days before the murder, but he insisted that he did not commit the murder.
 

 After considering the jury’s recommendation and the evidence presented at the
 
 Spencer
 
 hearing, the trial court sentenced Hodges to death. This appeal followed.
 

 II. ANALYSIS
 

 On appeal, Hodges contends that the trial court erred in (A) failing to allow the jury to determine if Hodges was mentally retarded; (B) finding that Hodges was not mentally retarded; (C) ruling that the State could discuss the collateral crime evidence during its rebuttal argument; (D) allowing the collateral crime evidence to become a feature of the trial; (E) refusing to allow Hodges to waive a penalty-phase jury; and (F) denying Hodges’ motion to bar a death sentence based on
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition to these claims raised by Hodges, we review the sufficiency of the evidence supporting Hodges’ conviction and the proportionality of his death sentence. We address each issue below and conclude that Hodges is not entitled to relief.
 

 A. Jury Determination of Mental Retardation Status
 

 Hodges argues that the trial court erred by rejecting his request to have the jury determine whether he was mentally retarded. This Court has previously rejected the claim that a defendant is entitled to a jury determination of his mental retardation status.
 
 See, e.g., Nixon v. State,
 
 2 So.3d 137, 145 (Fla.2009) (“[A] defendant ‘has no right under
 
 Ring
 
 and
 
 Atkins [v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002),] to a jury determination of whether he is mentally retarded.’ ” (quoting
 
 Arbelaez v. State,
 
 898 So.2d 25, 43 (Fla.2005))). Accordingly, the trial court in this case did not err by not presenting to the jury the issue of mental retardation as a bar to execution, and Hodges is not entitled to relief.
 

 B. Trial Court Determination of Mental Retardation Status
 

 Hodges challenges the trial court’s determination that he is not mentally retarded and that he is thus eligible for the death penalty. “The Florida Legislature enacted section 921.137 in 2001. It exempts the mentally retarded from the death penalty and establishes a method for determining . whether capital defendants are mentally retarded.”
 
 Phillips v. State,
 
 984 So.2d 503, 509 (Fla.2008). “[This Court] adopted rule 3.203 in response to the United States Supreme Court’s deci
 
 *527
 
 sion in
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held it unconstitutional to execute the mentally retarded.”
 
 Phillips,
 
 984 So.2d at 509 (citations omitted). The substantially similar statute and rule require the following:
 

 [A] defendant must prove mental retardation by demonstrating: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.
 
 See
 
 § 921.137(1), Fla. Stat. (2007); Fla. R.Crim. P. 3.203(b).
 

 Nixon,
 
 2 So.3d at 141; see
 
 also Phillips,
 
 984 So.2d at 509. The defendant has the burden to prove that he is mentally retarded by clear and convincing evidence. § 921.137(4), Fla. Stat. (2005). If a defendant fails to prove any of the three components, he or she will not be found to be mentally retarded.
 
 Nixon, 2
 
 So.3d at 142.
 

 “When reviewing mental retardation determinations, we must decide whether competent, substantial evidence supports the trial court’s findings. We do not ‘reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses.’ ”
 
 Nixon,
 
 2 So.3d at 141 (citation omitted) (quoting
 
 Brown v. State,
 
 959 So.2d 146, 149 (Fla.2007)). “[T]he concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the [decision].”
 
 Brown,
 
 959 So.2d at 149 (alteration in original) (quoting
 
 Tibbs v. State,
 
 397 So.2d 1120, 1123 (Fla.1981));
 
 see also Nixon,
 
 2 So.3d at 144. To the extent that the trial court’s decision concerns questions of law, the Court applies a de novo standard of review.
 
 Cherry v. State,
 
 959 So.2d 702, 712 (Fla.2007).
 

 1. Facts
 

 Prior to trial, Hodges filed a motion with the trial court to bar imposition of the death penalty, claiming that he was mentally retarded as defined by Florida Rule of Criminal Procedure 3.203(b) and thus ineligible for the death penalty. The trial court then held a series of mental retardation hearings. We highlight the key testimony here.
 

 Dr. Brett Turner, a psychologist retained by the defense, testified regarding his evaluations of Hodges. On the WAIS-III, Hodges received a full-scale IQ score of 62. Hodges’ school records indicated that Hodges was given the Wechsler Intelligence Scale for Children in the fifth and seventh grades, with resulting scores of 66, and that Hodges quit school in the eighth grade. Based solely upon Hodges’ school records, Dr. Turner ultimately opined that Hodges was mentally retarded. Similarly, Dr. Lawrence Gilgun, a psychologist appointed by the trial court, testified regarding his evaluations of Hodges. On the WAIS-III, Hodges received a full-scale IQ score of 69, and Hodges performed “very poorly” on a wide-range achievement test. Dr. Gilgun also opined that Hodges was mentally retarded.
 

 After the initial testimonies of Drs. Turner and Gilgun, the State produced approximately thirty-seven letters written to Officer Jennifer Luke that the State claimed were written by Hodges. Hodges initially indicated that he wrote the letters and copied many of the phrases from books. Later, though, Hodges stated that other inmates wrote the letters and that he then copied them in his own writing. After reviewing the letters, Dr. Turner stated that even if Hodges wrote them, his opinion would not likely have been different. Dr. Gilgun stated that the abstraction, language skills, and poetic expression in the letters “went beyond what [he]
 
 *528
 
 would expect ... a mentally retarded person to author” and that “the plot thickens because the defendant says he didn’t really write the letters ... and that one of his buddies at the jail actually composed it, and all he did was either copy it or sign his name to it.”
 

 A few months later, Dr. Gilgun filed with the trial court another psychological evaluation of Hodges that provided results of several additional tests that he administered to Hodges. On an additional intelligence test, Hodges obtained a score consistent with the prior tests, and on an achievement test, Hodges scored on second- and fourth-grade levels. On the Vineland Scales test — with Hodges’ aunt Rosia Ptomey and cousin Willie Mae Ross as the respondents — Hodges ranked in the second percentile or lower in each of the following categories: communication; daily living skills; socialization; and adaptive behavior composite. Two malingering tests indicated that Hodges was not malingering.
 

 At a later hearing, Dr. Gilgun testified that his opinion had changed — that Hodges was
 
 not
 
 mentally retarded because although Hodges’ scores on standardized intelligence tests fell in the mentally retarded range, Hodges did not exhibit deficiencies in adaptive functioning. Regarding the adaptive-functioning prong of the mental retardation test, Dr. Gilgun stated: “It is with a lot less certainty [than the first prong] because ... there seems to be a number of indicators that he is functioning above the retarded range. There’s some indicators that even indicate he’s functioning in the average range.”
 

 Dr. Gilgun explained that he recently learned that Tamara Wolfe had lived with Hodges for five months and Bonnie Chandler had lived with Hodges for five years.
 
 [2]
 
 Gilgun gave both women the Vineland Scales test, and there was a discrepancy between the results produced from the Vineland Scales tests given to Ross and Ptomey and Wolfe and Chandler. Dr. Gil-gun noted, “So two women [Wolfe and Chandler] who have had pretty extensive contact with him saw things quite a bit differently.” Dr. Gilgun explained: Wolfe saw Hodges as “adaptive” and as having adaptive-functioning scores in the “low average, average to high average range.” “In terms of daily living skills, [Wolfe] saw [Hodges] functioning in the high average range. In terms of socialization, Wolfe saw him functioning in the average range.” Chandler “saw him as functioning and communicating] in the moderately retarded range,” with “[v]ery poor communication abilities.” She “[s]aw him functioning in the average range in daily living skills and saw him functioning in the mildly retarded range in terms of socialization.” Wolfe and Chandler indicated that Hodges had the ability to write letters with ten sentences on his own, with very few mistakes in spelling and grammar.
 

 Dr. Brett Turner again testified and opined that he believed that Hodges’ IQ score of 62 on the WAIS-III was accurate and that based on his review of Hodges’ medical, vocational, and academic records, and further psychological testing, Hodges’ abilities and experiences were not contradictory to such an IQ score. Dr. Turner explained that he reviewed records, including the letters that Hodges allegedly wrote in prison and Hodges’ recorded phone conversations. Dr. Turner only interviewed Hodges and Hodges’ former employer, Ben Thomas, but Dr. Turner agreed that
 
 *529
 
 Hodges was both educable and capable of learning basic skills. Dr. Turner stated that Hodges did not evidence any significant word-finding difficulty; his thoughts were organized appropriately; there was no indication of any delusional thinking or perceptional distortions; there was no evidence of psychosis; and Hodges denied suicidal tendencies. Dr. Turner opined that Hodges met the criteria for mild mental retardation. Regarding adaptive behavior specifically, Dr. Turner stated: “[Y]ou have to remember adaptive functioning is a psychological term that is used to describe how a person copes in life, and it includes intelligence, it includes academic functioning, it includes vocational functioning.” “So again, it’s kind of hard to separate that out as you put it, a two-prong thing. They’re not really separate issues.”
 

 Jennifer Luke of the Cincinnati Police Department homicide unit testified that when evidence led to Hodges after the March 2008 murder of Lavern Jansen, Luke initiated contact with Hodges, and Hodges responded. Luke and Hodges wrote each other frequently, and eventually a phone was installed in Luke’s home so that Hodges could call her. Luke and Hodges spoke by phone “quite a bit,” and the calls were recorded. Luke and Hodges spoke mostly about personal issues, including “[their] feelings for each other, things he was feeling inside, of being locked up, how nobody but [Luke] was contacting him.” They also spoke about trouble they experienced in the past. In her letters, Luke asked questions, and Hodges answered either by letter or a phone call.
 

 Hodges asked Luke about her children and vacations and asked Luke to get him prescription reading glasses, for which he provided his prescription. Hodges also asked Luke to forward him money but to address it to another particular inmate because he would have to pay a fee on the money if she sent it directly to him. In one letter, Hodges asked Luke to send him a radio and included an order form upon which he had circled the desired radio and calculated the cost of the radio. After Luke sent thirty dollars, Hodges stated to her that he needed seventeen dollars more in order to purchase the radio. Hodges indicated on the phone to Luke that he had read 400 pages of the Bible, and he sent Luke some verses to read. He said, “I’ll read the verses, you read the verses, and then we’ll discuss them over the phone.”
 

 Bonnie Chandler testified that for approximately two years — around 1996 to 1998 — Hodges lived with her. Hodges was able to take care of himself in terms of hygiene and dress. “He was particular about the way he look[ed]. He dresse[d] well. He manicure[d] himself, cut[ ] his hair, ... he looked very nice.” Hodges picked out his own clothes and wore mostly “dressy” clothes that always matched. Chandler typically paid for Hodges’ clothes, but sometimes Hodges handled the transaction. Chandler explained: “He has taken the credit card and paid for purchases on his own, signed the credit card receipts. He’s done things on his own where I haven’t been there, sent him to the store for stuff and he’s taken money and brought back change.” Hodges also washed and ironed his own clothes and sometimes washed Chandler’s clothes. Hodges “cooked dinner every once in a while” and was able to do so without Chandler’s help. Chandler often went to the library and brought back children’s books, and to the best of her knowledge, Hodges was able to read the books to Chandler’s young daughter.
 

 Of the five years that Chandler knew Hodges, Hodges had a job for approximately six months. Sometimes Chandler
 
 *530
 
 gave Hodges money when he was not working. At- other times, Hodges asked Chandler’s family members for money and pawned items from Chandler’s home. After Hodges went back to prison, Chandler learned that Hodges stole a VCR and rings from Chandler’s father. Chandler found the pawn slips for the items with Hodges’ handwriting on them. Hodges also had a driver’s license for a period of time and drove Chandler’s car. Chandler and Hodges traveled to Pensacola once and Alabama three times. Hodges drove part of the way and was able to drive without assistance with road signs.
 

 Chandler received letters from Hodges when Hodges went back to prison. The letters included things “copied from poems or songs and only ... bits and parts would be ... his own thoughts.” To the best of Chandler’s knowledge, Hodges also wrote letters to his mother before she died.
 

 Tamara Wolfe testified that she too had lived with Hodges. Both Hodges and Wolfe got jobs at the Kenwood Mall working on a night-shift cleaning crew. When the supervisor left for the night, Hodges was in charge of all seven employees. Hodges would “[m]ake sure that we did our job, that if we needed anything, our supplies or cleaning supplies for our carts or anything, we would get a hold of [Hodges].” “He would just go behind us, you know, make sure that maybe all the trash cans was emptied, the glass windows was wiped downs, the floor was clean, the bathrooms was clean, toilet paper was filled, paper towels.” When a cleaning-crew employee did not do what he or she was supposed to do, Hodges wrote down what the employee failed to do.
 

 Wolfe and Hodges split bills evenly. Typically Hodges gave Wolfe his part of the money, and Wolfe sent the money to pay the bills. Wolfe typically cooked, and Hodges washed the dishes. Sometimes, though, Hodges cooked. Hodges had good hygiene and ironed his clothes; was able to grocery shop and do other types of shopping; and was able to make the financial transactions and ensure that he received the correct change. Hodges went to the food-stamp office and filled out the necessary paperwork by himself, and he then received food stamps. Hodges was on parole and went to his parole appointments as scheduled. He took the bus to get to those appointments and was always early.
 

 Wolfe and Hodges traveled from Cincinnati to Alabama by Greyhound bus, and Hodges chose the appropriate tickets for the trip and ensured that they were on the correct bus when they had to transfer buses. Once while on a bus, Hodges was reading. “[H]e found [the article] interesting” and “read [Wolfe] probably about a paragraph, two paragraphs out of it.” Hodges wrote Wolfe a letter when she left “asking [her] to stay and telling [her] [they] could work it out” and included his family members’ phone numbers and addresses.
 

 Anthony Joseph, Hodges’ former Ohio parole officer, testified that Hodges arrived on time for appointments, provided his paycheck stubs as required, and did not have difficulty understanding Joseph. While in an Ohio prison, Hodges was enrolled in a pre-GED class, and an evaluation form noted that “Inmate Hodges is progressing in all academic areas.”
 

 Ben Thomas testified that Hodges worked for Thomas’s small masonry business in Ohio. Hodges was a laborer and would “mix mortar, cut out brick, water proof, just general labor work.” Hodges mixed the mortar with the appropriate amount of sand according to the given recipe. Hodges sometimes drove the company truck to pick up lunch or supplies, likely with a mortar mixer, ladders, or a
 
 *531
 
 saw on the back of the truck. In order to pay for gasoline, Thomas would give Hodges a credit card, and Hodges would return with it. When Thomas asked Hodges to perform a new job, he gave Hodges instructions, but Thomas did not recall having to repeat the instructions in order for Hodges to follow them. Hodges also used hydraulic lifts, which lift a person between forty to eighty feet off the ground, and he used gas and electric saws and masonry drills. During the time that Hodges was back in prison, Hodges wrote Thomas a letter asking for a job, which was properly addressed to Thomas’s home.
 

 Frank Fillingim, the ECSO investigating officer in Belanger’s death, testified that he retrieved letters from Marie Fi-field, a friend of Hodges. Fifield indicated to Fillingim that Hodges had written her approximately eighty letters since Hodges had been in jail. Some of the letters were cards with illustrations and captions. Fil-lingim stated: “I have to assume that [the illustrations and captions.were] drawn by Mr. Hodges ... [b]ecause there are so many pictures. If you had someone else doing it, he kept someone busy full-time, sir. He did trace some. He did some tracing.” Fillingim testified that the letters “show that [Hodges] knows how to write a letter, knows how to draw a picture and knows how to paste pictures to cards and to rewrite captions of cartoons.”
 

 Fillingim also testified about Hodges’ ability to formulate and execute plans. He stated that Hodges lied to Fifield by telling her that his niece Cora was his daughter and had someone impersonate Cora on a three-way call with Fifield. Fillingim opined, “It’s an excellent con job to be able to set it up to try to impress this lady.” It enabled Hodges to “look like [he was] a good, strong family man.” And regarding Belanger’s murder, Fillingim opined: “The fact of the matter is that someone came in, in broad daylight in the morning and was able to entice her to open the door ... and then took her out at the door, locked the door and moved in. I think that’s a plan.”
 

 Larry Ronell Salter, formerly incarcerated with Hodges, testified that he saw Hodges write letters to their mutual friend Fifield. Sometimes Hodges included poems, and sometimes Salter gave Hodges poems from cards that he received. Salter stated that Hodges read the cards himself and that if Hodges read the poem and wanted to use it, Hodges would copy the context of the poem into his letters. When asked whether Salter ever saw anyone else write things out for Hodges, Salter indicated, “He would just sit at his desk and write out of his head.” Salter explained that for a while Salter would fill in the captions in the small box in the cartoon because Hodges could not see in the box to write. Salter also showed Hodges how to use a newspaper to create an image on a letter, and Hodges then put such images on the letters and cards he wrote to Fi-field. Salter saw Hodges do things such as glue pictures and phrases to the cards. “Sometimes [Salter] would draw a little something for [Hodges].”
 

 Salter also testified that on one occasion, Salter, Hodges, and another inmate named Keith were all in Salter’s cell. Keith was trying to avoid his charges, and Hodges told Keith “what to say to the doctor in order to get to Chattahoochee.” Salter explained:
 

 [Hodges] said as long as you tell the psych that you had mental problems before, like in going to school or whatever, this, that and the other, that there’s a test that he’s going to give you or something that you’ve got to take. If you fail this test or do this test like this, or however he was telling him, then he can get him off, you know what I mean. He said that that’s what he was going to do
 
 *532
 
 if they didn’t disregard the death penalty on him in this case.
 

 Breedlove, Hodges’ former cell mate, testified that he saw Hodges write letters to Fifield “[j]ust about all day every day.” “[Hodges] wrote free hand,” and Breed-love never saw people write anything out for Hodges to copy. Hodges read the Bible,
 
 Chicken Soup for a Prisoner’s Soul,
 
 the newspaper, horoscopes, and another book the name of which Breedlove had forgotten. Breedlove stated, “He used to read stuff out of and write down on paper what it said,” including poems, and use those things in his letters. Hodges read the Bible to Breedlove, and the two men had “real educated conversations.”
 

 Hodges gave a lengthy testimony, some of which is highlighted here. Hodges testified that he was in special education classes in school and that there was a history of mental illness in his family. Hodges denied that he was the supervisor of the cleaning crew but admitted to telling others that he was. Hodges stated that he simply “ma[d]e sure that certain spots were clean” and noticed whether anyone “left early to cheat on their time sheets.” Regarding his job in the masonry business, Hodges stated that he was able to remember lunch orders for his coworkers “because [the order] was always about the same, 3 hamburgers, fry and Coke.” When asked whether he ever used a backhoe, Hodges stated that he did mix dirt with a backhoe but that “you didn’t have no special license to do it. Everybody there did it, you know.” Hodges denied ever using a drill.
 

 Hodges stated that he had been in and out of jail since he was seventeen or eighteen years old. When asked about the letters he wrote while incarcerated and “how those letters came to be in [his] handwriting,” Hodges stated:
 

 Well I mostly had people mostly wrote them and I rewrote them. You know, like I would get a letter from somebody and they would read it and you know they would answer it back. They will write it out, then they will read it to me. And if I like it, I will rewrite it and send to that person.
 

 Hodges stated: “[T]he letters I could write I couldn’t say what I wanted to say because I couldn’t spell and read them that good.” Hodges identified two books as belonging to him and stated that he used them to assist in writing letters. Hodges stated that he had someone read Luke’s letters to him and that he was able to read “[s]ome of [them].” The following exchange occurred regarding the letters in evidence.
 

 Q. Now you are trying to tell us that every time you wrote a letter somebody was sitting there with you writing it out and telling you what to say, correct?
 

 A. I am not trying — that what I am telling you. Yes.
 

 [[Image here]]
 

 Q. Okay. You are saying that somebody sat there day in and day out and basically wrote out everything that’s in that 10,12-inch stack of letters?
 

 A. Yeah, people help me.
 

 [[Image here]]
 

 Q. Who else [helped you write the letters]? Anyone other than Salter, Breedlove and the other person you first said, Mr. Grimmons?
 

 A. There’s a whole lot of people.
 

 Q. Tell me their names.
 

 A. I don’t know them by name.
 

 Hodges admitted that many letters to Fifield were conversational as opposed to poetic. He also stated that he sent cards to Fifield and that other people would help him paste poems and horoscopes into the cards. Hodges explained that he used sev
 
 *533
 
 eral different names and addresses in the return address because he stopped hearing from Fifield and felt that the jail was holding his letters. He thought that maybe the mail would be sent out if it had another inmate’s name on it. In the letters, Hodges indicated that Fifield should write him back under another inmate’s name.
 

 Regarding- driving, Hodges stated that he did not get a driver’s license when he became old enough because “[he] couldn’t read and write. Like I can’t now really.” In Ohio, he passed the oral test. Regarding his traveling with Wolfe, Hodges stated that Wolfe planned the trip and that “[f]rom Ohio to Alabama, you know, I wouldn’t have to get off but one road.... It run me all the way to my house.”
 

 Hodges stated that he never wrote a letter to Wolfe but that he “might have left a note” and that he wrote Chandler while he was in jail in Cincinnati. When questioned about his mention of an ex-wife in his letters to Fifield, Hodges stated: “I would say [Chandler] was, you know, because we was considered — when she was coming to visit me in the penitentiary— common law marriage.” Hodges denied having ever read to Wolfe on the bus as Wolfe testified. When asked whether he read books to Chandler’s children, Hodges replied: “Her 3-year-old had little books I would read what I could out of that to her. You know, I could read a little bit, but not no whole lot.”
 

 Ultimately, the trial court denied Hodges’ motion, determining that Hodges had not proven each element of the three-pronged mental retardation test. The trial court concluded that Hodges had established the intellectual-functioning prong of the mental retardation test by clear and convincing evidence but that the evidence regarding the adaptive-functioning prong was in “clear contrast.” The trial court concluded that rather than clearly and convincingly showing deficits in adaptive functioning, the totality of the evidence established that Hodges had “virtually no deficits in adaptive behavior.” The trial court explained that Hodges’ “abilities to sustain necessary activities of daily living such that he can function independently in the community [were] not limited” and that he was “capable socially, economically, and developmentally to function without significant assistance from others.” Given its conclusion that Hodges failed to establish the adaptive-functioning prong of the mental retardation standard, the trial court did not address the third prong— onset before age eighteen. The trial court made extensive findings, which we address as necessary below.
 

 2. Analysis
 

 On appeal, Hodges only challenges the trial court’s finding that the totality of the evidence established that Hodges did not experience concurrent deficits in adaptive behavior. Therefore, we address only that prong of the mental retardation standard. We conclude that the trial court did not err.
 

 “In Florida, defendants claiming mental retardation are required to show that their low IQ is accompanied by deficits in adaptive behavior.”
 
 Phillips,
 
 984 So.2d at 511; see
 
 also Rodriguez v. State,
 
 919 So.2d 1252, 1266 (Fla.2005) (“[L]ow IQ does not mean mental retardation. For a valid diagnosis of mental retardation ... there must also be deficits in the defendant’s adaptive functioning.”) (quoting trial court’s order). “Adaptive functioning refers to how effectively individuals cope with common life demands and ‘how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.’ ”
 
 Phillips,
 
 984 So.2d at 511 (quoting
 
 *534
 

 Rodriguez,
 
 919 So.2d at 1266 n. 8). To be diagnosed as mentally retarded, Hodges must show significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, and work.
 
 See Atkins,
 
 536 U.S. at 308 n. 3, 122 S.Ct. 2242. Moreover, subaverage intellectual functioning must exist at the same time as the adaptive deficits, and there must be current adaptive deficits.
 
 Jones v. State,
 
 966 So.2d 319, 326 (Fla.2007).
 

 We reject Hodges’ argument that the trial court erred in determining that he did not suffer from deficits in adaptive functioning. In
 
 Phillips,
 
 which involved substantially similar factual findings, we held that there was competent, substantial evidence to support the trial court’s determination that Phillips did not suffer from deficiencies in adaptive functioning. In that case, the evidence established that Phillips was able to support himself and his daily behavior:
 

 Phillips supported himself. He worked as short-order cook, a garbage collector, and a dishwasher. The mental health experts generally agreed that Phillips possessed job skills that people with mental retardation lacked. Specifically, the defense’s expert admitted that Phillips’s position as a short-order cook was an “unusually high level” job for someone who has mental retardation.
 

 Phillips also functioned well at home. He resided with his mother. According to her, he paid most of the bills and did the majority of the household chores. Phillips was also described as a great son, brother, and uncle. Phillips purchased a new car for his mother and a typewriter for his sister. He spent a lot of time with his nieces and nephews, and “was real good with them.” Phillips often kept the children overnight, took them for ice cream, and would give them rides when needed. In addition to driving, Phillips cooked and went grocery shopping, skills that are indicative of the ability to cope with life’s common demands.
 

 Phillips v. State,
 
 984 So.2d at 511. Moreover, “the planning of the murder and cover-up” and Phillips’ actions during the murder itself were “inconsistent with a finding that Phillips suffers from mental retardation.” The Court explained:
 

 To commit the crime, Phillips, having discovered that his parole officer was generally the last to leave the office, lay in wait behind dumpsters outside of the building. When the parole officer emerged and there were no witnesses present, Phillips unloaded his gun into the officer. He reloaded the gun and shot the parole officer three more times. Phillips then retrieved the shell casings from the ground, fled the scene, and disposed of the gun. After he was apprehended, officers tried on several occasions to interview Phillips, but he refused to speak.
 

 Id.
 
 at 512.
 

 We ultimately concluded that “Phillips’s ability to orchestrate and carry out his crimes, his foresight, and his acts of self-preservation indicate that he has the ability to adapt to his surroundings.”
 
 Id.
 
 We then stated: “It is clear from the evidence that Phillips does not suffer from adaptive impairments. Aside from personal independence, Phillips has demonstrated that he is healthy, wellnourished and wellg-roomed, and exhibits good hygiene.”
 
 Id.
 

 Similarly, in
 
 Jones,
 
 966 So.2d at 328, we held that competent, substantial evidence supported the trial court’s determination that Jones did not suffer from deficits in adaptive functioning. Among other things, the Court emphasized that Jones’s “lan
 
 *535
 
 guage skills in writing, speaking, and other intellectual skills are strong in light of his dropping out of school at an early age” and that before committing the murders “Jones traveled alone, lived in several states, and supported himself through various jobs.” Moreover, “[Jones] had girlfriends at various times and for several years lived with a ‘common law wife,’ as he correctly termed her.”
 
 Id.
 

 We hold that the trial court’s conclusion that Hodges did not suffer from deficits in adaptive functioning is supported by competent, substantial evidence and is in keeping with this Court’s precedent. In Hodges’ case, several witnesses testified about Hodges’ daily living and other capabilities, experts opined about Hodges’ adaptive functioning, and the trial court made lengthy findings based on the evidence presented. Evidence showed that like Phillips, Hodges supported himself at times by working labor jobs, such as working for Ben Thomas’s masonry business. In that position, Hodges was able to mix mortar with the appropriate amount of sand, cut bricks, drive Thomas’s truck, and obtain lunch for the other employees. Hodges used hydraulic lifts, gas and electric saws, masonry drills, and Thomas’s credit card. Evidence also showed that Hodges supervised, albeit apparently without an official “supervisor” title, a night-shift cleaning crew.
 

 Also like Phillips, -Hodges functioned well at home. Evidence showed that Hodges cleaned up after meals and occasionally cooked, was able to drive, and read books to one girlfriend’s young daughter. Hodges dressed well, cut his hair, manicured himself, and washed and ironed his own clothes and sometimes his girlfriend’s clothes. Hodges shopped for groceries and other things, made the necessary monetary transactions for the purchases, and ensured that he received the correct change. When Hodges needed money, he even independently applied for food stamps and pawned items for cash.
 

 Moreover, regarding “the planning of the murder and cover-up” as this Court emphasized in
 
 Phillips,
 
 Hodges not only locked Belanger’s door once inside her home, but he seemingly anticipated that others might have a key and therefore pushed a chair against the door to prevent anyone from opening it. Once Belanger’s family arrived and began to congregate by the front and back doors, Hodges left through a side window and dropped photographs in an attempt to frame his nephew.
 

 Furthermore, as in
 
 Jones,
 
 Hodges was capable of traveling independently to and from work and appointments with his parole officer and from Ohio to Alabama and Florida. On some long trips, Hodges drove without anyone instructing him on how to get to his destination. On other long trips, Hodges arranged travel by bus, including successfully arranging bus transfers along the way. Moreover, like Jones, Hodges had girlfriends, including both Chandler and Wolfe, with whom he lived for extended time periods, and he referred to Chandler as his “common law” wife.
 

 The abundant evidence regarding Hodges’ writing capabilities also supports the trial court’s conclusion that Hodges has not shown deficits in adaptive functioning. While there was some question regarding whether Hodges actually wrote the letters submitted into evidence (because Hodges claimed that he was unable to read and write well), various witnesses testified that Hodges was capable of reading and writing. For example, Chandler testified that Hodges read children’s books to her young daughter; Wolfe testified that Hodges had once read to her on a bus trip and on another occasion had left her a note; and Salter and Breedlove testified that Hodges wrote multiple letters while incarcerated
 
 *536
 
 and read and selected poems that he liked to incorporate in those letters.
 

 In addition to generally challenging the trial court’s conclusion on his mental retardation status, Hodges presented various arguments attacking Dr. Gil-gun’s expert opinion, claiming that his opinion was flawed, and arguments challenging the trial court’s fact-finding. We reject each argument. In
 
 Jones,
 
 we determined that the relevant inquiry under the second prong of the mental retardation standard was whether a defendant demonstrated adaptive functioning as an adult, not whether the defendant demonstrated adaptive functioning prior to age eighteen. 966 So.2d at 327. We did not, however, mandate that a defendant’s adaptive behavior and IQ be tested at the exact same time. Hodges was an adult during the periods when he interacted with Wolfe and Chandler. Thus, the fact that Wolfe and Chandler had no contact with Hodges for several years prior to the administration of the Vineland Scales tests in 2006 does not render their observations irrelevant. We have also consistently held this Court will not “reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses.”
 
 Nixon,
 
 2 So.3d. at 141 (quoting
 
 Brown,
 
 959 So.2d at 149). Likewise, “[w]ith regard to expert opinion ... the court has discretion to accept or reject such testimony.”
 
 Jones,
 
 966 So.2d at 327;
 
 see also Evans v. State,
 
 800 So.2d 182, 188 (Fla.2001) (applying an abuse-of-discretion standard to the trial court’s determination of competency made after hearing conflicting expert testimony).
 

 Lastly, we address Hodges’ argument that the trial court improperly relied upon Hodges’ in-court testimony to reach its conclusion that Hodges was not mentally retarded. In
 
 Johnson v. State,
 
 442 So.2d 185, 190 (Fla.1983), the defendant took “issue with the fact that the trial judge in finding that the[ ] mitigating circumstances did not apply took into account his ‘own observations of the Defendant during the trial, as well as his testimony in pretrial proceedings.’ ”
 
 Id.
 
 This Court held: “[T]he judge is not relying on information that is not available to the defendant. Although justice should be blind, judges are not. They may properly notice a defendant’s behavior and draw inferences concerning matters such as whether the defendant is capable of appreciating the criminality of his conduct.”
 
 Id.
 
 The Court further explained:
 

 It would help if a judge who relies on his personal observations would describe them in detail in order to give a reviewing court a basis for deciding whether his conclusions are correct. However, in this case the trial judge gave sufficient reasons to support his conclusions independent of the personal observations, so we find no error.
 

 Id.
 

 In Hodges’ case, the trial court made lengthy findings in reaching its conclusion that Hodges was not mentally retarded. As part of its findings, the trial court noted Hodges’ testimony and demeanor in the courtroom.
 

 [Hodges] could follow the track of thinking in questions, clearly respond to the questions, provide additional information if he thought his answers to the specific question was not adequate to get his point across. He very clearly comprehended everything that was going on in this proceeding and behaved in a most appropriate and responsive fashion.
 

 We reject Hodges’ argument and find that the trial court’s findings were in conformity with
 
 Johnson.
 
 As we stated in
 
 Johnson,
 
 the trial court in Hodges’ case “properly notice[d]” Hodges’ in-court behavior and capabilities — such as Hodges’ ability
 
 *537
 
 to “clearly respond to the questions” and ability to “provide additional information if he thought his answers ... [were] not adequate” — and then properly “described] them in detail.”
 
 Johnson,
 
 442 So.2d at 190. As discussed previously, based on the evidence presented by both lay and expert witnesses, the trial court went on to make multiple findings regarding Hodges’ daily living. These findings were “sufficient reasons to support his conclusions independent of the personal observations.”
 
 Id.
 
 at 190.
 

 Furthermore, the trial court’s reliance upon Hodges’ in-court testimony conforms with
 
 Johnson
 
 in that the trial court did not rely on “information that [was] not available to the defendant.”
 
 Id.
 
 Both expert witnesses previously testified that a defendant’s ability to communicate is relevant to a mental retardation diagnosis. Specifically, during Dr. Gilgun’s testimony regarding administering the Vineland Scales test to Ptomey, Ross, Chandler, and Wolfe, he explained that communication skills is one category assessed by the Vineland Scales test. Although Dr. Turner did not administer the Vineland Scales test to any witnesses, when asked to describe the test, he also stated that one of the categories of the test is communication abilities.
 

 Based on the foregoing, Hodges is not entitled to relief. The trial court’s determination that Hodges did not suffer from deficits in adaptive functioning is supported by competent, substantial evidence.
 

 C. Collateral Crime Evidence in Closing Argument
 

 In this issue, Hodges challenges the trial court’s ruling on a motion in limine. During its initial closing argument, the State highlighted much of the evidence indicating that Hodges was the person who killed Belanger but did not mention the collateral crime evidence. Before beginning its closing, the defense made an oral motion in limine, requesting that if it refrained from discussing the collateral crime evidence, the State be precluded from mentioning the collateral crime evidence during its rebuttal argument. In the alternative, the defense requested an opportunity to respond to the State’s rebuttal in the event that the State discussed the collateral crime evidence. The State contended that were the defense to argue that Hodges was not the perpetrator of the Belanger homicide, the State should be permitted to discuss the collateral crime evidence to the extent that it rebutted the identity defense. The trial court was persuaded by the State’s argument and denied the motion.
 

 This Court has explained that “the role of counsel in closing argument is to assist the jury in analyzing [the] evidence” presented at trial.
 
 Ruiz v. State,
 
 743 So.2d 1, 4 (Fla.1999). Attorneys are permitted wide latitude in closing arguments but are not permitted to make improper argument.
 
 Gore v. State,
 
 719 So.2d 1197, 1200 (Fla.1998). Generally, rebuttal argument is an opportunity to respond to the opposing party, not an opportunity to raise new matters.
 
 See Seaboard Air Line Ry. v. Rentz,
 
 60 Fla. 449, 54 So. 20, 23 (1910);
 
 Collins Fruit Co. v. Giglio,
 
 184 So.2d 447, 449 (Fla. 2d DCA 1966). “A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion.”
 
 Merck v. State,
 
 975 So.2d 1054, 1061 (Fla.2007) (citing
 
 Dufour v. State,
 
 905 So.2d 42, 64 (Fla.2005)).
 

 In this case, the trial court did not abuse its discretion by denying the defense’s motion in limine. The parties do not dispute that the collateral crime evidence was relevant to the issue of identity and admissible on that basis, and when arguing its motion in limine,, the defense never asserted willingness to refrain from raising the issue of
 
 *538
 
 identity in its closing. In fact, during its closing, the defense repeatedly asserted that the pivotal issue in Hodges’ case was the identity of the perpetrator. The trial court properly ruled that — regardless of whether the defense commented directly on the collateral crime evidence — the State could argue from the collateral crime evidence in an effort to rebut the defense theory that Hodges did not perpetrate the Belanger homicide. Because the collateral crime evidence was properly admitted into evidence and was relevant to rebutting the defense’s expressly argued theory, the trial court did not abuse its discretion in concluding that the State could argue from the collateral crime evidence during rebuttal.
 

 Moreover, contrary to Hodges’ argument, the instant case is not analogous to
 
 Heddendorf v. Joyce,
 
 178 So.2d 126 (Fla. 2d DCA 1965). In that case, the plaintiffs counsel produced a chart outlining his mathematical calculations supporting a damage award of $61,035.96 — which included a calculation of per diem pain and suffering damages — during his rebuttal closing argument. In his initial closing, counsel had discussed only $8,301.70 in hospital bills and out-of-pocket expenses and alluded to pain and suffering without assigning a dollar figure. The Second District Court of Appeal determined that the per diem argument was raised “for the first time in the trial” during rebuttal and that exploring this method of calculation for the first time after the defendant had no opportunity to respond was “unfair” and “prejudicial.” 178 So.2d at 128, 130.
 
 Heddendorf
 
 held that “the trial judge erred in permitting plaintiff to utilize the per diem - argument and demonstrative charts for the first time in that part of the closing argument which may be termed as ‘final summation,’ ‘rebuttal argument’ or ‘concluding argument.’ ”
 
 Id.
 
 at 131. The instant case is distinguishable because the collateral crime evidence was not raised “for the first time in the trial” during rebuttal.
 
 Id.
 
 at 128. In Hodges’ case, the defense and the jury were well aware of the evidence of the collateral homicide and the State’s position that the collateral crime evidence was probative of whether Hodges committed the Belanger homicide. Before each collateral crime witness testified, the trial court instructed the jury that the evidence was to be considered for the “limited purpose of proving motive, intent, preparation, plan, identity, the absence of mistake or accident.” Because the State’s argument based on the collateral crime evidence was not raised for the first time during rebuttal, the instant case does not raise the same fairness considerations as were present in
 
 Heddendorf.
 

 D. Collateral Crime Evidence as Feature of Trial
 

 Hodges concedes that pursuant to
 
 Williams,
 
 the trial court properly allowed the State to present evidence of a collateral homicide in his trial for the Be-langer homicide. Hodges contends, however, that the collateral crime evidence impermissibly became a feature of his -trial. A trial court’s decision regarding the admission of collateral crime evidence is subject to an abuse-of-discretion review.
 
 LaMarca v. State,
 
 785 So.2d 1209, 1212 (Fla.2001). We conclude that the trial court did not abuse its discretion in Hodges’ trial.
 

 This Court has explained that relevant evidence of collateral crimes impermissibly becomes a feature of the trial when the evidence “ ‘transeend[s] the bounds of relevancy to the charge being tried’ and the prosecution ‘devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.’ ”
 
 Conde v. State,
 
 860 So.2d 930, 945 (Fla.2003) (alteration in
 
 *539
 
 original) (quoting
 
 Williams v. State,
 
 117 So.2d 473, 475 (Fla.1960)). This Court stated that “it is not solely the quantity but also the quality and nature of collateral crimes evidence in relation to the issues to be proven” that determines whether the collateral crime evidence was a feature of the trial.
 
 Id.
 
 at 946. This Court noted that it had previously affirmed the admission of extensive collateral crimes evidence where that evidence was wholly probative of material issues, see,
 
 e.g., Wuornos v. State,
 
 644 So.2d 1000, 1006-07 (Fla.1994) (affirming admission of evidence of six collateral murders), and that where the Court had reversed the admission of extensive collateral crime evidence it did so because the evidence lacked relevance,
 
 see, e.g., Steverson v. State,
 
 695 So.2d 687, 690 (Fla.1997) (holding admission of evidence of resisting arrest was reversible error because “blow-by-blow” account of law enforcement officer’s injuries and recovery was irrelevant to charged offense).
 

 In
 
 Conde,
 
 this Court found no error where the trial court allowed the State over the course of three days to present evidence concerning five collateral murders in the prosecution of a sixth murder. This Court explained that “the length of this testimony was unavoidable given the fact that five collateral crimes were involved.” 860 So.2d at 946 — 47. We further explained that the evidence did not constitute a feature of the trial because the trial court repeatedly instructed the jury on the proper purpose of
 
 Williams
 
 rule evidence and the State limited its presentation by calling witnesses who could summarize the evidence and by introducing only noncumulative photographs of each crime.
 
 Id.
 
 at 947.
 

 Similarly, in
 
 Peterson v. State,
 
 2 So.3d 146 (Fla.),
 
 cert. denied,
 
 — U.S. —, 130 S.Ct. 208, 175 L.Ed.2d 144 (2009), this Court found that evidence of three collateral robberies did not impermissibly become a feature of Peterson’s murder trial. This Court reasoned that the trial court did not abuse its discretion because (1) all of the collateral robberies were sufficiently similar to the charged crime to be probative of identity, which rendered the evidence relevant and admissible; (2) the State limited its presentation to witnesses that were unavoidable due to the number of collateral crimes involved; (3) the State limited the emotional impact of its presentation by having only four victims testify and by cooperating with the trial court and the defense to ensure that unduly prejudicial evidence was not admitted; (4) none of the evidence was offered merely to demonstrate Peterson’s criminal propensity; and (5) the trial court scrupulously instructed the jury on the proper use of
 
 Williams
 
 rule evidence before each collateral crime witness.
 
 Peterson,
 
 2 So.3d at 156.
 

 The collateral crime evidence presented in the instant case was not nearly as voluminous as that presented in
 
 Conde
 
 and
 
 Peterson.
 
 Moreover, each of the factors discussed in
 
 Peterson
 
 was present in Hodges’ trial. The defense does not dispute on appeal that the collateral crime evidence was relevant and admissible. The State called relatively few witnesses who testified about the collateral crime. For example, the State relied on Officer Jennifer Luke to explain virtually the entire Jansen investigation rather than calling the numerous law enforcement officers who were involved. The State appears to have taken steps to ensure that the evidence was not emotionally charged and unfairly prejudicial. For example, the State played a 911 call recording rather than presenting the neighbor who saw Jansen’s attacker and called a bank records custodian to testify about Jansen’s trip to the bank the morning of the homicide rather than calling the relative who drove Jansen to the bank. Next, all of the
 
 *540
 
 evidence presented about the collateral homicide was relevant to establishing either how that crime was similar to the charged offense or was relevant to establishing that Hodges was the person who killed Jansen. None of the evidence was offered merely to impugn Hodges’ character. And finally, the trial court scrupulously instructed the jury on the proper use of
 
 Williams
 
 rule evidence before each collateral crime witness.
 

 Based on the foregoing, Hodges has not established that the trial court abused its discretion. The collateral crime evidence did not become a feature of his trial.
 

 E. Waiver of Penalty-Phase Jury
 

 Before voir dire, Hodges moved to waive the presence of a penalty-phase jury. ■ The defense asserted that the right to a penalty-phase jury was “a right individual to the defendant under the Sixth and [Fourteenth] Amendments and under the Florida [C]onstitution” and that it would be unconstitutional to require a penalty-phase jury where the defendant makes a valid waiver of his right. After hearing argument on the motion, the trial court rejected Hodges’ request to waive the penalty-phase jury. Hodges argues that the trial court erred in denying his motion because (1) the trial court should be required to support its denial of a waiver by citing to factual issues in the penalty-phase evidence that require a jury resolution, and (2) the right to a penalty-phase jury is held by the defendant, not the trial court.
 

 Hodges did not raise his first argument before the trial court. Thus, his argument that a trial court should be required to provide findings supporting its denial of a waiver is not preserved for appellate review.
 
 See Victorino v. State,
 
 23 So.3d 87 (Fla.2009). Hodges’ second argument— that the trial court should not be able to reject a valid waiver because the right to a penalty-phase jury is held by the defendant — has been previously rejected by this Court. This Court has repeatedly held that “even after a defendant makes a knowing and intelligent waiver of this right, a trial judge ‘may in his or her discretion either
 
 require an advisory jury recommendation,
 
 or may proceed to sentence the defendant’ without one.”
 
 Reynolds v. State,
 
 934 So.2d 1128, 1148 (Fla.2006) (quoting
 
 State v. Carr,
 
 336 So.2d 358, 359 (Fla.1976)). Hodges offers no compelling reason for this Court to depart from its precedent. Accordingly, he is not entitled to a new penalty phase.
 

 F.
 
 Ring
 
 Arguments
 

 Hodges filed pretrial motions to bar imposition of the death sentence on the basis that Florida’s capital sentencing scheme is unconstitutional under
 
 Ring.
 
 Hodges now contends that because this Court has wrongly interpreted the impact of
 
 Ring
 
 on Florida’s death sentencing scheme, the trial court erred in denying his motions. Hodges asserts that this Court has erred in concluding that
 
 Ring
 
 is not implicated where one of the aggravating circumstances found by the trial court is that the defendant has been previously convicted of a prior violent felony. Hodges also asserts that this Court has erred by concluding that Florida may allow nonunanimous jury sentencing recommendations. Hodges’ arguments are without merit.
 

 This Court has repeatedly held that
 
 Ring
 
 does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.
 
 See, e.g., Victorino v. State,
 
 23 So.3d 87, 107-08 (Fla.2009). Hodges offers no argument in opposition to this holding that has not been previously considered by this Court. Thus, he offers no persuasive reason to depart from precedent. Similarly, Hodges offers no reason for this Court to recede
 
 *541
 
 from its holding,
 
 see, e.g., Frances v. State,
 
 970 So.2d 806, 822 (Fla.2007), that Florida’s capital sentencing scheme need not require unanimous sentencing recommendations. Given that the aggravating factors of prior violent felony and under a sentence of imprisonment indisputably apply in the instant case — Hodges was convicted of robbery and aggravated assault prior to sentencing in this case and was on parole at the time of the Belanger’s murder — Hodges is not entitled to relief on the basis of
 
 Ring.
 

 G. Sufficiency of Evidence
 

 In all direct appeals where the death penalty has been imposed, this Court reviews the record to determine whether the evidence is sufficient to support the murder conviction. Fla. R.App. P. 9.142(a)(6). “If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.”
 
 Deparvine v. State,
 
 995 So.2d 351, 376 (Fla.2008) (quoting
 
 Reynolds v. State,
 
 934 So.2d 1128, 1145 (Fla.2006)). In this case, the evidence was sufficient to find Hodges guilty of first-degree murder both on the theory of premeditated murder and on the theory of felony murder.
 

 The evidence established that Hodges killed Belanger after consciously deciding to do so. Dr. Cumberland testified that the manner of death was homicide and that Belanger was killed by head wounds inflicted with a hammer and neck wounds inflicted by a knife. One of the neck wounds was an incised wound that was four and three-quarter inches long, and the stab wound cut Belanger’s jugular vein. Dr. Cumberland identified four separate wounds that would each have been life-threatening and other, nonlethal wounds that were indicative of defensive wounds. This Court has held that “the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation.”
 
 Williams v. State,
 
 967 So.2d 735, 758 (Fla.2007) (quoting
 
 Perry v. State,
 
 801 So.2d 78, 85-86 (Fla.2001)). Given this evidence of multiple injuries to the head and neck, a reasonable jury could have concluded that the perpetrator formed a premeditated intent to kill.
 

 The following evidence established that Hodges was the person who inflicted the fatal wounds. Debra Taylor testified that she saw a man flee from Belanger’s home on the morning of December 19, 2001. She described the jacket worn by the man. Law enforcement officers found a jacket, two socks, and two shoes along the path of the fleeing man. Witness Williams identified the recovered jacket and shoes as the jacket and shoes worn by Hodges around the time of the murder. DNA testing of the recovered socks indicated that at least one of the socks was almost certainly worn by Hodges. The mitochondrial DNA profile developed from a hair found on Belan-ger’s body and one of the hairs found on the jacket matched Hodges’ known mitochondrial DNA profile, and the partial YSTR DNA profile developed from an anal swab of the victim matched Hodges’ known DNA profile on all six available markers. Hodges was also implicated by the photographs left outside of Belanger’s window. Two of those photographs had prints consistent with Hodges’ known fingerprints, and one of the photographs had Hodges’ handwriting on the back. Finally, two witnesses testified that Hodges told them that he killed a woman in Florida. Based on the foregoing, a rational trier of fact could have found Hodges guilty of premeditated murder.
 

 The evidence in this case also was sufficient to support a conviction on the theory
 
 *542
 
 of felony murder. The evidence established that Hodges was engaged in a sexual battery or an attempted sexual battery when he killed Belanger. The witnesses who observed Belanger’s body at the crime scene testified that Belanger’s pants and underwear had been pulled down. Dr. Cumberland testified that there were two tears to her rectum and wounds that may have been defensive wounds. And again, male DNA was obtained from an anal swab taken at the crime scene and the partial YSTR DNA profile developed from that swab was consistent with Hodges’ DNA.
 

 H. Proportionality
 

 To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of the circumstances and compares each case with other capital cases. Fla. R.App. P. 9.142(a)(6). The Court does not simply compare the number of aggravating and mitigating circumstances.
 
 Taylor v. State,
 
 937 So.2d 590, 601 (Fla.2006). “In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998) (citing
 
 State v. Dixon,
 
 283 So.2d 1, 7 (Fla.1973)). Hodges’ death sentence is proportionate.
 

 In Hodges’ case, the jury recommended a death sentence by a ten-to-two vote and the trial court imposed that sentence. The trial court found five statutory aggravating factors — (1) the offense was committed by person under sentence of imprisonment; (2) the defendant had been convicted of a prior violent felony; (3) the offense was committed during commission of or attempt to commit sexual battery; (4) the offense was committed for pecuniary gain; (5) and the offense was especially heinous, atrocious, or cruel (HAC) — placing either great weight or moderate weight on each factor. Qualitatively, prior violent felony and HAC are among the weightiest aggravators set out in the statutory sentencing scheme.
 
 See Zommer v. State,
 
 31 So.3d 733, 751 (Fla.2010),
 
 cert. denied,
 
 — U.S. —, 131 S.Ct. 192, 178 L.Ed.2d 115 (2010).
 

 As statutory mitigation, the trial court found and assigned moderate weight to the extreme mental or emotional disturbance mitigator and minimal weight to the mitigating factors of age and substantially impaired ability to conform conduct to the requirements of law. The trial court also found and weighed numerous nonstatutory mitigating factors.
 

 In comparison with factually analogous cases in which this Court ruled that death was a proportionate penalty, the sentence here is constitutionally proportionate. For example, in
 
 Murray v. State,
 
 3 So.3d 1108 (Fla.),
 
 cert. denied,
 
 — U.S. —, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009), Murray was convicted of burglary, sexual battery, and first-degree murder. The victim had been fatally beaten, stabbed, sexually battered, and strangled in her home. The trial court found four aggravators — prior violent felony, commission of the murder during a burglary or sexual battery or both, committed for pecuniary gain, and HAC. The trial court found no statutory mitigation but found five nonstatutory mitigating factors. On appeal, this Court concluded that Murray’s death sentence was proportionate.
 
 Id.
 
 at 1112-14, 1125. While Hodges’ case is more mitigated than
 
 Murray,
 
 Hodges’ case is also more aggravated because of the trial court’s finding of the under sentence of imprisonment aggravating factor.
 

 Hodges’ sentence is also proportionate when compared to cases in which the trial court has found similar aggravation as in Hodges’ case and substantial statutory
 
 *543
 
 mitigation. For example, in
 
 Johnston v.
 
 State, 841 So.2d 349, 360-61 (Fla.2002), this Court upheld Johnston’s death sentence as proportionate where the trial court found four aggravators — prior violent felony, commission of the murder while engaged in commission of sexual battery and kidnapping, committed for pecuniary gain, and HAC — assigned moderate weight to the statutory mitigating factor of substantially impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law, and found twenty-six nonstatutory mitigating factors.
 
 See also Pope v. State,
 
 679 So.2d 710, 713, 716 (Fla.1996) (upholding death penalty as proportionate in stabbing death where trial court found two aggravating factors (committed for pecuniary gain and prior violent felony) and two statutory mitigating factors (extreme mental or emotional disturbance and substantially impaired capacity), as well as non-statutory mitigating circumstances such as intoxication at the time of the offense).
 

 Based on the foregoing, we conclude that Hodges’ death sentence is proportionate.
 

 III. CONCLUSION
 

 In accord with the above analysis, we affirm Hodges’ conviction and sentence.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . Some of defendant Hodges’ relatives who testified at his trial did not include the "s” when spelling their names.
 

 [2]
 

 . Chandler testified that she lived with Hodges for
 
 two
 
 years but that she dated Hodges for five years.