984 So.2d 503 (2008)
Harry Franklin PHILLIPS, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-2554.
Supreme Court of Florida.
March 20, 2008.
Rehearing Denied June 12, 2008.
*505 Neal Dupree, Capital Collateral Regional Counsel, William M. Hennis, III, Assistant CCRC, Southern Region, Fort Lauderdale, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
PER CURIAM.
Harry Franklin Phillips, an inmate sentenced to death, appeals an order denying his successive motion to vacate his judgment and sentence and an order concluding that he is not mentally retarded under Florida Rule of Criminal Procedure 3.203. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the circuit court's finding that Phillips is not mentally retarded and affirm its denial of relief.

I. FACTS AND PROCEDURAL HISTORY
Phillips was convicted of first-degree murder for the 1982 shooting death of his parole supervisor, Bjorn Thomas Svenson, and sentenced to death. On direct appeal, *506 this Court affirmed his conviction and sentence. See Phillips v. State, 476 So.2d 194, 197 (Fla.1985).[1] After his death warrant was signed, Phillips filed a petition for habeas corpus alleging a violation of his rights under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and the Eighth and Fourteenth Amendments. This Court denied the petition as procedurally barred. Phillips v. Dugger, 515 So.2d 227, 228 (Fla.1987).
Phillips filed an amended motion for postconviction relief, raising twenty-four claims. See Phillips v. State, 894 So.2d 28, 33-34 (Fla.2004).[2] After a Huff[3] hearing, the trial court summarily denied the amended motion. Phillips appealed the denial and petitioned for a writ of habeas corpus. See Phillips, 894 So.2d at 34.[4] Phillips filed a "Notice of Supplemental Authority and Motion for Permission to Submit Supplemental Briefing" related to the United States Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and this Court permitted supplemental briefing on the mental retardation issues. We affirmed the denial of postconviction relief and denied the habeas petition. Phillips, 894 So.2d at 34. Regarding the mental retardation determination, we noted that "Phillips is free to file a motion under rule 3.203," but expressed "no opinion regarding the merits of such a claim." Id. at 40. We later relinquished jurisdiction for a determination of mental retardation pursuant to Florida Rule of Criminal Procedure 3.203.

The Evidentiary Hearing
The trial court conducted a two-day evidentiary hearing on Phillips's mental retardation claim. At the hearing, the defense presented two expert witnesses: Dr. Glen Caddy and Dr. Denis Keyes. The State presented the expert testimony of Dr. Enrique Suarez. Dr. Joyce Carbonell's intellectual evaluation of Phillips was also introduced through the testimony of Dr. Caddy.[5] The evidence is summarized below.
Phillips was born in Belle Glade, Florida, and moved to Miami accompanied by his parents and two siblings when he was about six years old. Before moving to Miami, Phillips's parents made their living picking vegetables or working in the fields. Phillips's father eventually obtained employment as a truck driver and was frequently gone from home. The family did not benefit much from the improvement in the father's employment as they did not "see much, if any, of his paycheck."
Phillips lived his life in serious poverty, suffered emotional and physical abuse from his father, suffered the loss of his only male role models (both the father and older brother left the home) and had academic *507 difficulties. Phillips dropped out of school during the tenth grade. While in school he earned "mostly D's and C's." Phillips's academic trouble related partly to his absenteeismhe often skipped school and was suspended on a number of occasions.
As a juvenile Phillips briefly was incarcerated in a youth home. After dropping out of school, he worked as a dishwasher at the Miami Heart Institute. In 1962, he was convicted and sentenced as an adult for the first time and paroled in 1970. Upon his release, he worked for the Department of Sanitation in Dade County, where he was described as helpful and a good worker.[6] He was later arrested and convicted on an armed robbery charge, for which he was incarcerated until 1982. He was released, and records indicate that he violated his parole. Shortly thereafter, Phillips was convicted of murder and has been incarcerated on death row since 1983.

Dr. Joyce Lynn Carbonell
In 1987, Dr. Joyce Carbonell was asked to assess Phillips's current level of functioning as well as his functioning as it related to his case. Her assessment was based on affidavits from family and friends, an interview with a former teacher, the court and Department of Corrections' records, and other available materials.
Dr. Carbonell performed several tests on Phillips: the Wechsler Adult Intelligence Scale (WAIS)Revised; the Wide Range Achievement Test-Revised (WRAT-R2); the Peabody Individual Achievement Test (PIAT); the Weschsler Memory Scale (WMS); and the Rorschach Test. Based on Phillips's test performance, Dr. Carbonell concluded that while he was functioning in the borderline range of intellectual functioning, his IQ score of 75 "technically . . . would not qualify as mental retardation."

Dr. Denis Keyes
In 2000, Dr. Keyes, an Associate Professor of Special Education at the College of Charleston in South Carolina, examined Phillips for the defense. Dr. Keyes tested Phillips's intellectual functioning utilizing the following tests: Draw-a-Person test; a Developmental Test of Visual-Motor Integration; the Bender-Gestalt test-which also tests visual and motor integration; the Woodcock-Johnsontesting cognitive achievement; and the WAIS-III. Based on Phillips's test performance, Dr. Keyes opined that he performed at a significantly subaverage intellectual level.
In concluding that Phillips had significant deficits in adaptive functioning, Dr. Keyes conducted a retrospective diagnosis.[7] To evaluate Phillips's adaptive behavior, Dr. Keyes interviewed Phillips, his mother and sister, and Phillips's childhood friend and fellow death row inmate, Norman Parker.[8] Dr. Keyes also reviewed Phillips's school records. Those records revealed that while Phillips attended *508 school from elementary to tenth grade, he earned C's, D's and F's. Phillips's school history also revealed that he attended school when the system was segregated and special education was not available to him.
From these record observations and tests, Dr. Keyes concluded that Phillips's full scale IQ was 74 and that the onset of his intellectual functioning and adaptive deficits occurred before age 18. Even though Dr. Keyes's evaluation did not establish that Phillips had deficits in his adaptive functioning existing concurrent with his subaverage intellect, he opined that Phillips is mentally retarded.

Dr. Glen Caddy
Dr. Caddy, a Ph.D. in clinical psychology, testified as a defense expert. To assess Phillips's current intellectual functioning, Dr. Caddy administered the WAIS-III. Dr. Caddy did not test Phillips's adaptive functioning.
Phillips achieved a full-scale IQ of 70 on the WAIS-III, placing him in the borderline range of mental retardation. Dr. Caddy described the different categories of intellectual functioning as follows: an IQ score below 70 is formally labeled mentally retarded and now called "extremely low"; an IQ between 70 and 79 is borderline, and generally borderline is not retarded; an IQ between 80 and 89 qualifies as a low normal intellect; and an IQ score within the 90 and 110 range is average.
When asked whether he had an opinion as to whether Phillips was mentally retarded, Dr. Caddy answered: "I have an opinion that he is functioning at an IQ of 70. I have an opinion that says that this condition has existed since very early in his life. I have not done personally those tests that look at adaptive functioning. I have simply read those from others." Dr. Caddy ultimately concluded that based on his evaluations and everything he read, he would place Phillips in the retarded category in some areas and the borderline category in others.

Dr. Enrique Suarez
Dr. Enrique Suarez, a specialist in neuropsychology, was the State's only expert. Dr. Suarez holds a Ph.D. in psychology and has conducted over 3000 forensic psychiatric evaluations. Dr. Suarez defined the criteria for mental retardation as significantly subnormal intellectual functioning, concurrent and present impairments in adaptive functioning in at least two areas,[9] and onset before age 18.
To assess Phillips's intellectual functioning, Dr. Suarez administered the Test of Nonverbal Intelligence-III (TONI-III). He did not utilize the WAIS-III test because Phillips had previously been administered the WAIS and Dr. Suarez was concerned that Phillips had become familiar with the format. Phillips scored an IQ of 86 on the TONI-III, which is in the low average range.[10]
To determine whether Phillips was malingering, Dr. Suarez also administered various validity tests. Based on the inconsistent scores obtained, Dr. Suarez opined that Phillips was not putting forth sufficient effort or was actively attempting to *509 provide incorrect information. Dr. Suarez suggested that Phillips malingered on these tests because to do otherwise "could have dire negative effects on the examinee's life."
Dr. Suarez was the only expert to conduct validity testing on Phillips. He opined that "if you do a cognitive or neurocognitive evaluation and you don't do validity testing, you've done an incomplete assessment." The other doctors disagreed and did not believe that validity testing was necessary.
Based on his evaluations, Dr. Suarez opined that although Phillips is functioning at a low average level of intelligence, he is not mentally retarded. Phillips has neither the requisite IQ to classify him as mentally retarded nor the necessary concurrent deficits in adaptive functioning. Dr. Suarez also noted that
[t]he information that's available prior to my evaluating him in and of itself would suggest that he's not mentally retarded, and that a lot of the results that have been obtained by previous evaluators [have] been obtained without the benefit of concurrent validity testing, which eliminates the ability to specify whether those instances reflected good efforts and an intention to do the best one can on these tests.
After hearing the testimony and reviewing the evidence, the trial court concluded that Phillips did not prove mental retardation by clear and convincing evidence. Phillips appeals that decision, raising the issues discussed below.

II. ANALYSIS
Phillips challenges the circuit court's determination that he is not mentally retarded in accordance with the definitions outlined in Florida Rule of Criminal Procedure 3.203 and section 921.137(1), Florida Statutes (2006). The Florida Legislature enacted section 921.137 in 2001. It exempts the mentally retarded from the death penalty and establishes a method for determining whether capital defendants are mentally retarded. See § 921.137, Fla. Stat. We adopted rule 3.203 in response to the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held it unconstitutional to execute the mentally retarded.
Pursuant to both the statute and the rule, a defendant must prove mental retardation by demonstrating: (1) significantly subaverage general intellectual functioning, (2) existing concurrently with deficits in adaptive behavior, and (3) which has manifested during the period from conception to age 18. § 921.137(1), Fla. Stat.; see also Fla. R.Crim. P. 3.203(b). The circuit court concluded that Phillips failed to prove any of these factors by clear and convincing evidence. We review the circuit court's decision to determine whether it is supported by competent substantial evidence. See Cherry v. State, 959 So.2d 702, 712 (Fla.2007) ("In reviewing mental retardation determinations in previous cases, we have employed the standard of whether competent, substantial evidence supported the circuit court's determination.") We review each of the factors in turn.[11]

*510 A. Intellectual Functioning
Phillips first argues that the circuit court erred in finding that he does not function at a significantly subaverage intellectual level. Phillips claims that because there is a measurement error of about five points in assessing IQ, mental retardation can be diagnosed in individuals with IQs ranging from 65 to 75. We disagree, and affirm the trial court's finding that Phillips did not satisfy the first prong of the mental retardation definition.
Section 921.137(1) defines subaverage general intellectual functioning as "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities." We have consistently interpreted this definition to require a defendant seeking exemption from execution to establish he has an IQ of 70 or below. See Cherry, 959 So.2d at 711-714 (finding that section 921.137 provides a strict cutoff of an IQ score of 70); Zack v. State, 911 So.2d 1190, 1201 (Fla.2005) (finding that to be exempt from execution under Atkins, a defendant must meet Florida's standard for mental retardation, which requires he establish that he has an IQ of 70 or below); see also Jones v. State, 966 So.2d 319, 329 (Fla.2007) ("[U]nder the plain language of the statute, `significantly subaverage general intellectual functioning' correlates with an IQ of 70 or below.")
Phillips's scores on the WAIS were as follows: 75 (1987), 74 (2000), and 70 (2005). Based on these scores, the defense experts opined that Phillips has "significantly subaverage intellectual functioning." The State's expert concluded to the contrary, finding that Phillips's low intellectual scores were a result of malingering, not mental retardation. Because both defense experts failed to perform a complete evaluation of Phillipsi.e., they did not test for malingeringthe court accepted the state's expert's opinion over that of the defense's experts. Although Phillips challenges the trial court's credibility finding, we give deference to the court's evaluation of the expert opinions. See Brown v. State, 959 So.2d 146, 149 (Fla.2007) ("This Court does not . . . second-guess the circuit court's findings as to the credibility of witnesses." (citing Trotter v. State, 932 So.2d 1045, 1050 (Fla.2006))); Bottoson v. State, 813 So.2d 31, 33 n. 3 (Fla.2002) ("We give deference to the trial court's credibility evaluation of Dr. Pritchard's and Dr. Dee's opinions."); Porter v. State, 788 So.2d 917, 923 (Fla.2001) ("We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.").
Even were we to disregard the circuit court's credibility finding, Phillips's IQ scores do not indicate that he is mentally retarded. In Jones, 966 So.2d at 329, we found that IQ scores ranging from 67 to 72 did not equate to significantly subaverage general intellectual functioning. See also Rodgers v. State, 948 So.2d 655, 661 (Fla. 2006) (finding that the defendant did not prove he was retarded under section 921.137 despite the defense expert's finding that the defendant had an IQ of 69 and was mentally retarded); Burns v. State, 944 So.2d 234, 247 (Fla.2006) (finding that even though the defendant scored an IQ of 69 on one of the expert's IQ tests, the defendant did not meet the first prong of the mental retardation determination because the more credible expert scored the defendant's IQ at 74).
*511 Here, the majority of Phillips's IQ scores exceed that required under section 921.137. Moreover, the court questioned the validity of the only IQ score falling within the statutory range for mental retardation. Therefore, competent substantial evidence supports the trial court's finding that Phillips did not meet the first prong of the mental retardation definition.

B. Adaptive Behavior
Next, Phillips argues that the trial court erred in concluding that he failed to demonstrate deficits in adaptive functioning sufficient for a diagnosis of mental retardation. In Florida, defendants claiming mental retardation are required to show that their low IQ is accompanied by deficits in adaptive behavior. Rodriguez v. State, 919 So.2d at 1252, 1266 (Fla.2005) ("[L]ow IQ does not mean mental retardation. For a valid diagnosis of mental retardation . . . there must also be deficits in the defendant's adaptive functioning." (quoting trial court's order)). "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.'" Id. at 1266 n. 8 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed.2000)). To be diagnosed mentally retarded, Phillips must show "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Id.
The State's expert, Dr. Suarez, was the only mental health expert to test Phillips's adaptive functioning contemporaneously with his IQ. Dr. Keyes, the only defense expert to evaluate Phillips's adaptive functioning, relied on the technique of retrospective diagnosis, focusing on Phillips's adaptive behavior before age 18. However, in Jones, 966 So.2d at 325-27, we held retrospective diagnosis insufficient to satisfy the second prong of the mental retardation definition. We found that both the statute and the rule require significantly subaverage general intellectual functioning to exist concurrently with deficits in adaptive behavior. Id. (citing § 921.137(1), Fla. Stat. (2007); Fla. R.Crim. P. 3.203(b)). Dr. Keyes tested Phillips's intellectual functioning in 2000; however, he did not assess Phillips's adaptive functioning as of that date.
Moreover, the record contains competent substantial evidence that Phillips does not suffer from deficiencies in adaptive functioning. Phillips supported himself. He worked as short-order cook, a garbage collector, and a dishwasher. The mental health experts generally agreed that Phillips possessed job skills that people with mental retardation lacked. Specifically, the defense's expert admitted that Phillips's position as a short-order cook was an "unusually high level" job for someone who has mental retardation.
Phillips also functioned well at home. He resided with his mother. According to her, he paid most of the bills and did the majority of the household chores. Phillips was also described as a great son, brother, and uncle. Phillips purchased a new car for his mother and a typewriter for his sister. He spent a lot of time with his nieces and nephews, and "was real good with them." Phillips often kept the children overnight, took them for ice cream, and would give them rides when needed. In addition to driving, Phillips cooked and went grocery shopping, skills that are indicative of the ability to cope with life's common demands.
*512 The experts also agreed that the planning of the murder and cover-up in this case are inconsistent with a finding that Phillips suffers from mental retardation. Although Phillips argues that his maladjusted behavior does not constitute adaptive behavior, we agree with the circuit court that argument is untenable. The mental health experts generally agreed that persons suffering from mental retardation lack goal-directedness and the ability to plan. Phillips had both. To commit the crime, Phillips, having discovered that his parole officer was generally the last to leave the office, lay in wait behind dumpsters outside of the building. When the parole officer emerged and there were no witnesses present, Phillips unloaded his gun into the officer. He reloaded the gun and shot the parole officer three more times. Phillips then retrieved the shell casings from the ground, fled the scene, and disposed of the gun. After he was apprehended, officers tried on several occasions to interview Phillips, but he refused to speak.
Also, while in jail, Phillips authored an alibi letter and a letter dubbed the "Bro White" letter. In the "Bro White" letter, Phillips informed the recipient that he was aware of the State's witnesses against him and that he had sent the names and addresses of their family members to a "reliable source on the outside world." He further penned, "I hate like hell to do that. But the innocent must suffer."
Phillips's ability to orchestrate and carry out his crimes, his foresight, and his acts of self-preservation indicate that he has the ability to adapt to his surroundings. Also noteworthy is that Phillips killed the parole officer in a cold, calculated, and premeditated manner. A cold, calculated, premeditated murder is "the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage." Franklin v. State, 965 So.2d 79, 98 (Fla.2007). A CCP killing demonstrates "that the defendant had a careful plan or prearranged design to commit murder before the fatal incident . . .; that the defendant exhibited heightened premeditation." Id. The actions required to satisfy the CCP aggravator are not indicative of mental retardation. See Atkins, 536 U.S. at 319-20, 122 S.Ct. 2242 ("Exempting the mentally retarded from [the death penalty] will not affect the `cold calculus that precedes the decision' of other potential murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders.")
It is clear from the evidence that Phillips does not suffer from adaptive impairments. Aside from personal independence, Phillips has demonstrated that he is healthy, wellnourished and wellgroomed, and exhibits good hygiene. Likewise, there was "no evidence of deficits of adaptive behavior in regards to home living, use of community resources, or leisure." Thus, as the foregoing illustrates, competent substantial evidence supports the trial court's conclusion that Phillips failed to prove the second prongimpairments in adaptive functioning.

C. Onset Before Age Eighteen
The final factor in determining mental retardation is onset before age 18. Ample evidence supports the trial court's conclusion that Phillips failed to prove this prong. Phillips's school history does not suggest onset before the age of 18. While it is true that Phillips achieved C's and D's in school, his poor performance is easily attributed to his truancy, his repeated suspensions from school, and his juvenile delinquency. As the trial court found, "there was no evidence [t]o support the Defendant's contention that his poor grades were a result of mental retardation."
*513 Moreover, anecdotes about Phillips's childhood do not suggest a manifestation of low IQ and adaptive deficits before age 18. For example, the defense suggests that Phillips was adaptively impaired because he would swim in his clothes rather than in his underwear when he and his childhood friends broke into pool areas. However, as the defense expert agreed, Phillips could have swum fully clothed due to shyness rather than because of any mental retardation. In short, Phillips does not meet the third criterion, onset of significantly subaverage general intellectual functioning with deficits in adaptive behavior before age 18. Thus, contrary to Phillips's contentions, he is not so impaired as to fall within the range of mentally retarded offenders exempt from the death penalty.

III. CONCLUSION
For the reasons discussed above, we affirm the trial court's order denying Phillips's successive 3.851 motion and concluding that Phillips is not mentally retarded.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Phillips raised five issues: (1) the trial court erred in allowing the State to elicit collateral crimes testimony; (2) prejudicial comments elicited by the State deprived Phillips of a fair trial; (3) the trial court erred in refusing to give a requested alibi instruction; (4) the trial court erroneously found the HAC aggravator; and (5) the trial court improperly found the CCP aggravator.
[2] See id. at 34 n. 4 (listing claims).
[3] Huff v. State, 622 So.2d 982 (Fla. 1993).
[4] Phillips raised eleven claims on appeal, and filed a habeas petition raising four claims of ineffective assistance of appellate counsel. Id. at 34-35, 40 (listing claims).
[5] Dr. Carbonell was requested to evaluate Phillips to "assess his current level of functioning as well as his functioning as it may have related to his 1983 case." Specifically, Dr. Carbonell was to focus on Phillips's competency to stand trial and the existence of mitigating factors.
[6] Phillips's employment history also includes a position in the produce section of a grocery store, lawn maintenance, and multiple years as a short order cook.
[7] Although Dr. Keyes claims to have assessed deficits in Phillips's adaptive functioning that existed concurrently with his subaverage intellectual quotient, the record does not support his contention. In 2000, Phillips did have an IQ of 70; however, his adaptive functioning was assessed by evaluating his behavior at or around age eighteen. As stated above, Dr. Keyes interviewed Phillips's family and friends, who admittedly had not had any significant contact with him since at least his incarceration for this crime in 1983. Immediately before his current incarceration, Phillips had served seventeen years of a twenty-year sentence.
[8] Parker has been incarcerated since 1981.
[9] The defendant must suffer from deficits or impairments in adaptive functioning in at least two of the following areas: communication, self-care, home living, social interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety.
[10] The court did not consider the results of Dr. Suarez's intellectual testing in its determination because the only two testing instruments provided for under Florida Rule of Criminal Procedure 3.203 and Florida Administrative Code Rule 65G-4.011 are the Stanford-Binet and the WAIS-III.
[11] Phillips also argues that the clear and convincing evidence standard of section 921.137(4), Florida Statutes (2001) (prohibiting the execution of a mentally retarded defendant), which the trial court applied, is unconstitutional. However, we do not address this claim. Singletary v. State, 322 So.2d 551, 552 (Fla. 1975) ("[C]ourts should not pass upon the constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds."). Here, there was no evidence demonstrating Phillips has significant subaverage intellectual functioning existing concurrently with deficits in his adaptive behavior. Therefore, Phillips's claim fails even under the more lenient preponderance-of-the-evidence standard.